**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**IN RE: ALL YOU, LLC**                                    **CASE NO. 5:10-bk-74049**
                                                                      **CHAPTER 11**

**AGREED DISCLOSURE STATEMENT**

**I.  INTRODUCTION**

All You, LLC, the Debtor, filed this Chapter 11 bankruptcy case on August 2, 2010.
Under Chapter 11, the Debtor, its creditors, and other parties in interest are permitted to
propose a plan of reorganization (hereinafter referred to as the "Plan").  The Plan may
provide for the Debtor to reorganize by continuing to operate, to liquidate by selling assets
of the estate, or a combination of both.  Prior to proposing a plan, a party is required to
submit (and obtain approval by the Court) a disclosure statement which provides the
Debtor's creditors and other parties in interest with sufficient information such as to allow
them to decide whether to accept or reject any proposed plans.

The Debtor and one of its Creditors, First Security Bank (hereinafter referred to as
"First Security"), have each has proposed a plan in this case.  This Agreed Disclosure
Statement which will serve as the disclosure statement for both First Security and the
Debtor's proposed Chapter 11 Plans.  If this Agreed Disclosure Statement is being sent
to you by the Debtor, a copy of the Debtor's proposed Chapter 11 Plan is enclosed with
this Agreed Disclosure Statement.  Likewise, if this Agreed Disclosure Statement is being
sent to you by First Security, a copy of First Security's proposed Chapter 11 Plan is being
enclosed with this Agreed Disclosure Statement.

THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR
THE ENCLOSED PLAN.  The Plan is included only for informational purposes to more fully

disclose the Plan proponents.  The Plan enclosed may be modified and may not be the final Plan submitted to you in a subsequent mailing.  Each of the parties are required to gain approval of this Disclosure Statement and then will seek approval of the Plan once the Disclosure Statement is approved.  You will be sent by subsequent mailing a copy of said Plan with a ballot allowing you to approve or reject the enclosed proposed Plan.

### A.    Purpose of this Document

This Disclosure Statement summarizes what is in the competing plans of the Debtor and First Security, and tells you certain information relating to those Plans and the process the Court follows in determining whether or not to confirm the Plans.   READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:

(1)    WHO CAN VOTE OR OBJECT,

(2)    WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION,

(3)    THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,

(4)    WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,

(5)    WHAT IS THE EFFECT OF CONFIRMATION, AND

(6)    WHETHER THIS PLAN IS FEASIBLE.

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own attorney to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.  The Code requires a Disclosure

Statement to contain "adequate information" concerning the Plan. The Plan must contain enough information to enable parties affected by the Plan to make an informed judgment about the Plan.

**B.    Deadlines for Voting and Objecting; Date of Approval of Disclosure Statement and Date of Plan Confirmation Hearing.**

You are being sent this information as the first step in the Plan Confirmation process. Included with this Disclosure Statement is a Notice of Opportunity to Object. If you do not object to the Disclosure Statement, the Debtor and First Security will report to the Court the lack of objection. If this Disclosure Statement is approved, the Debtor and First Security will each send you a copy of their proposed Plans along with a ballot giving you the opportunity to accept or reject their Plans. If there are any inconsistencies between a Plan and the Disclosure Statement, the Plan's provisions will govern. Again, the Disclosure Statement is a document which serves to provide you with enough information for you to make an informed decision about the Debtor's Plan and First Security's Plan. If you object to the Disclosure Statement as containing inadequate information, you should file your objection with the Bankruptcy Court and your objection will be set for hearing before the Bankruptcy Judge.

THE COURT HAS NOT YET CONFIRMED EITHER OF THE PLANS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLANS ARE NOT BINDING ON ANYONE. YOUR APPROVAL OF THIS DISCLOSURE STATEMENT IS NOT THE SAME AS YOUR APPROVAL OF EITHER OF THE PLANS AND DOES NOT BIND YOU TO THE TERMS OF EITHER OF THE PLANS. THE COURT WILL NOT CONFIRM EITHER PLAN UNTIL YOU HAVE RECEIVED A COPY OF EACH

3

PLAN ALONG WITH A BALLOT AND HAVE THE OPPORTUNITY TO VOTE ON YOUR ACCEPTANCE OR REJECTION OF EACH OF THE PLANS.   WHEN THE COURT CONFIRMS ONE OF THE PLANS AFTER NOTICE AND A HEARING, THEN THE CONFIRMED PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

### C.    Disclaimer

The financial data relied upon in formulating the Debtor's Plan is based on the Debtor's best knowledge and belief.  The data used to formulate First Security's Plan is the Debtor's historical performance and current market values of the Debtor's real estate. The Court has not yet determined whether or not you should support either of the Plan.  The Financial Statements herein are unaudited.

## II. BACKGROUND

Debtor is a closely-held Arkansas Limited Liability Company whose sole members are non-debtor Hossein Kouchehbagh and his wife, Vahideh Zamani.  Debtor has no other employees.   Debtor owns and operates a variety of rental properties in Washington County, Arkansas, and Debtor's sole income is derived from rental payments received from the rental properties.  Other than the real estate, the only other assets owned by Debtor are a checking account.  First Security Bank holds a mortgage lien on the investment properties and and the rental payment stream realized from the real estate.

As shown in its Chapter 11 Petition and Schedules, Debtor has scheduled only three (3) creditors: First Security, which holds a secured claim secured by a lien on all assets of the Debtor other than its checking account (*i.e.*, a lien on all the real properties owned by

4

Debtor and the rents arising from those real properties) in the total amount of Five Million Nine Hundred Thirty-Four Thousand Two Hundred Eighty-Five and 51/100 Dollars ($5,934,285.51) as of April 20, 2011; the Washington County Tax Collector, which holds an unsecured priority claim in the amount of Thirty-Three Thousand Three Hundred Forty-Six and 32/100 Dollars ($33,346.32) due to the Debtor's failure to pay property taxes, and Arkansas Western Gas, which has an unsecured non-priority claim of Three Thousand Three Hundred and No/100 Dollars ($3,300.00).[1]   Additionally, the Bradford Place POA has filed a proof of claim regarding unpaid property owners association dues in the amount of Three Thousand Nine Hundred Thirty-Eight and 34/100 Dollars ($3,938.34).   The Internal Revenue Service initially filed a proof of claim as well, but has since amended its claim to reflect a zero balance.  The Debtor claims no exemptions in its schedules.

Hossein Kouchehbagh has managed these properties since the inception of the Debtor. If the Debtor's Chapter 11 Plan is confirmed, Mr. Kouchehbagh will continue to manage the leased properties and prepare certain properties for sale or liquidation in order to reduce the debt service to First Security Bank.  If First Security Bank's Chapter 11 Plan is confirmed, the Debtor's real estate will be liquidated and the proceeds used to pay back First Security Bank, then other creditors of the Debtor, with any surplus being returned to

---

[1]The Washington County Tax Collector has filed a Proof of Claim claiming real estate taxes in the total amount of One Hundred Four Thousand Seven Hundred Seventy-Nine and 22/100 Dollars ($104,779.22); however, based upon the supporting documentation this figure appears to include tax bills owed by other entities related to the Debtor but which are not a part of this bankruptcy filing.  When these non-Debtor entities' tax bills are removed, the Debtor appears to owe Thirty Three Thousand Three Hundred Forty-Six and 32/100 Dollars ($33,346.32) in real estate taxes, which is commiserate with the Debtor's estimation of a Thirty-Two Thousand and No/100 Dollars ($32,000.00) tax debt as contained in its Petition and Schedules.

5

the Debtor.

Vahideh Zamani is married to Hossein Kouchehbagh and is a silent partner in the running of the business.

Prior to Debtor's bankruptcy filing, First Security obtained a Decree of Foreclosure as to all of Debtor's real property in a case styled *First Security Bank v. All You, LLC, et al.*, Circuit Court of Washington County, Arkansas, Case No. CV-10-712-2 (hereinafter referred to as the "Foreclosure Action"); however, the foreclosure sale scheduled in the Foreclosure Action was stayed with the filing of the Debtor's Chapter 11 Petition. On August 11, 2010, First Security filed its Motion for Relief from Stay herein in which it requested that the automatic stay be lifted such that it could proceed with the foreclosure sale in the Foreclosure Action. The Motion was denied by the Court on September 22, 2010.

First Security's secured claim continues to accrue interest at the rate of Nine Hundred Fifty-Five and 99/100 Dollars ($955.99) per day. First Security contends that due to high vacancy rates and the dilapidated condition of the Debtor's rental properties, which conditions include, but are not limited to, the water being disconnected at certain of the properties, a non-functioning or partially functioning sewage system, properties not up to applicable state and municipal building codes, and a fire which occurred on April 25, 2011 and which has displaced one of the Debtor's primary tenants, the rental payments received from the rental properties are insufficient to service the interest continuing to accrue on First Security's secured claim, much less retire the judgment balance of the secured claim.

### A.    Financial Condition of the Debtor

First Security believes that the Debtor's current financial condition is precarious. Based on recent appraisals and related testimony, it is believed by First Security and the Debtor that the Debtor currently has an equity cushion in the real properties, and as a result, First Security's claim is fully secured.  Appraisals obtained by First Security show the Debtor's real properties have a total combined appraised value of Seven Million Seven Hundred Seventy-Five Thousand and No/100 Dollars ($7,777,000.00).  The Debtor's real property located at 1395 Henri De Tonti, Tontitown, Arkansas (hereinafter referred to as the "Tontitown Property"), which contains a retail shopping center, is the single most valuable asset owned by the Debtor with an appraised value of Five Million Seven Hundred Seventy-Five Thousand and No/100 Dollars ($5,775,000.00).

However, the Debtor's only income is the rental stream received by it from its real properties.  Based on the Debtor's operating reports filed herein, the Debtor has received the following total rental income from the real properties:

| MONTH | AMOUNT |
|---|---|
| September, 2010 | $10,030.00 |
| October | $16,800.00 |
| November | $10,814.87 |
| December | $16,301.00 |
| January, 2011 | $15,200.00 |
| February | $22,730.00 |
| March | $27,730.00 |
| April | $27,030.00 |

The Debtor has not yet filed operating reports for May, 2011.

7

Pursuant to the Court's Order entered on September 22, 2010, the Debtor is permitted to retain Seven Thousand and No/100 Dollars ($7,000.00) in monthly rental income to insure and maintain the real properties. All remaining rentals are then turned over to First Security, which holds a lien on all the rental payments.

The Tontitown Property contributes the bulk of the Debtor's rental income. The Debtor has previously opined in the Agreed Disclosure Statement filed previously herein that the Tontitown property, if fully rented, has the potential to earn approximately Forty Thousand and No/100 Dollars ($40,000.00) per month. However, with interest continuing to accrue on First Security's lien at the rate of Nine Hundred Fifty-Five and 99/100 Dollars ($955.99) per day, more than three-fourths of the Debtor's most optimistic rental income must be used each month to pay the daily accruing interest.

On April 25, 2011, the suite occupied by the gas station/convenience store tenant of the Debtor at the Tontitown Property caught fire and was severely damaged. Based on the previous Agreed Disclosure Statement, this tenant accounts for Three Thousand Five Hundred and No/100 Dollars ($3,500.00) of the Debtor's monthly rental income. This tenant has been forced to vacate the suite, and as of the date of this Disclosure Statement, the suite is vacant and has not yet been repaired.

During the pendency of this bankruptcy action, and even after the Debtor has been credited with the rentals turned over to First Security, First Security's lien on the Debtor's real properties has grown by over One Hundred Fifty Thousand and No/100 Dollars ($150,000.00).

### III.  Significant Events During the Bankruptcy

**A.      Bankruptcy Proceedings**

The following are significant events which have occurred during this case.  On August 11, 2010, First Security filed a Motion for Relief from Stay so that it could proceed with the foreclosure sale.  This Motion was denied by the Court. Part of the Court's decision to deny the Motion for Relief was a finding by the Court that there appeared to be a significant equity cushion in the Debtor's properties.   Additionally, the Court approved the Debtor's Motion for use of cash collateral with the provisions that the Debtor would turn over all money generated by the Debtor to First Security except for Seven Thousand and No/100 Dollars ($7,000.00) per month which the Debtor would use for the purpose of paying taxes, insurance, and repairs.

Currently, there are no adversary proceedings in this case.   First Security and the Debtor have each agreed upon the terms contained in this Agreed Disclosure Statement. If approved by the Court, both the Debtor and First Security will use this Agreed Disclosure Statement as their own disclosure statement.

First Security's Plan of Reorganization proposes to liquidate the investment properties in order to retire the Debtor's foreclosure judgment entered in the Foreclosure Action.  The Debtor's Plan of Reorganization proposes to allow the Debtor time to try to sell certain of the Debtor's properties over a three (3) year period with the goal of raising sufficient money to retire its debt

Previously, First Security and the Debtor submitted proposed Chapter 11 Plans. Each of these proposed Chapter 11 Plans were denied by the Court without prejudice.

9

The Debtor's previous Chapter 11 Plan and its current Plan proposes to sell all its properties over the first eighteen (18) months of the three year Plan except for the properties located at 1395 Henri De Tonti, Tontitown, Arkansas and 2325 N. College, Fayetteville, Arkansas (hereinafter referred to as the "College Avenue Property").  Any properties, excluding the Tontitown Property and the College Avenue Property not sold during the eighteen (18) month period will be surrendered back to First Security for liquidation.  By the end of the three (3) year Plan reorganization period, the Debtor's Plan provides that it will either have secured other financing to pay First Security in full or it will surrender the remaining two properties to First Security for liquidation wit the excess sales proceeds being paid to Debtor.

First Security's previous plan (and its current proposed plan) proposes to liquidate the Debtor's real estate assets.  First Security contends and has contended that, because it is fully secured, the Debtor may not cram down its debt to First Security and cannot retain the Tontitown Property and College Avenue Property free and clear of First Security's lien unless it is able to pay its entire Debt to First Security through the bankruptcy plan.  First Security's plans contend that the Debtor's goal of retaining the Tontitown Property cannot be accomplished mathematically based on (i) the sheer amount of First Security's lien, and (ii) the relatively small amount of the monthly rental payments it can receive from the Tontitown Property and other properties.

B.    **Other Legal Proceedings**

There are no other known legal proceedings which have not previously been disclosed in this Disclosure Statement.

10

**C.** **Actual and Projected Recovery of Preferential or Fraudulent Transfers**

Currently, the Debtor and First Security are each unaware of any preferential or fraudulent transfer and presently do not anticipate filing any such action in this case.

**D.** **Procedures Implemented to Resolve Financial Problems**

Under the Debtor's Plan, the Debtor will surrender to the respective Lending Institution any nonperforming properties and retain properties which show either significant equity or a positive cash flow. The Debtor believes this will allow the Debtor to be solvent going forward. Over the course of the three (3) year plan, the Debtor plans to sell all the property except for 1395 Henri De Tonti, Tontitown, Arkansas and 2325 N. College, Fayetteville, Arkansas. The sale of these properties will significantly lower the debt service to First Security. The Debtor will continue to try and lease the two retained properties.

**E.** **Current and Historical Financial Conditions**

The Debtor has been successful over the years in leasing out properties and generating income sufficient to meet its debt service. Recently, with the downturn in the real estate market, the Debtor has been in a negative cash flow situation. The Debtor's Chapter 11 Plan proposes the Debtor to retain investment properties which show either a positive cash flow or significant equity which would allow them to propose a feasible Plan. First Security Bank's Chapter 11 Plan proposes to immediately liquidate the properties in order to retire the Debtor's debt to it and then distribute any surplus first to the Debtor's unsecured creditors, and then to the Debtor. The Debtor has slowly been increasing amounts collected from the leased properties. In November the Debtor paid to First Security Bank approximately Nine Thousand Eight Hundred and No/100 Dollars

11

($9,800.00) and in December it was Twelve Thousand Fifty and No/100 Dollars ($12,050.00).

## IV.  SUMMARY OF THE PLAN OF REORGANIZATION

### A.    What Creditors and Interest Holders Will Receive Under the Proposed Plan

As required by the Bankruptcy Code, both the Debtor's and First Security's Plans classify claims and interests in various classes according to their right to priority.  The Plans state whether each class of claims or interests is impaired or unimpaired.  The Plans provide the treatment each class will receive.

### B.    Unclassified Claims

Certain types of claims are not placed into voting classes; instead they are unclassified.  They are not considered impaired and they do not vote on either of the Plans because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Proponents have not placed the following claims in a class.

#### 1.    Administrative Expenses

Administrative Expenses are claims for costs or expenses of administering the Debtor's Chapter 11 case which are allowed under Code section 507(a)(1).  The Code requires that all administrative claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

### 2.    Priority Tax Claims

Priority tax claims are certain unsecured income, employment and other taxes described by Code Section 507(a)(8).  The Code requires that each holder of such 507 (a)(8) priority tax claim receive the present value of such claim in deferred cash payments, over a period not exceeding six years from the date of the assessment of such tax.  The Debtor believes that it is current on all taxes which would result in a priority tax claim under 507(a)(8).

### C.    Classified Claims and Interests

### 1.    Classes of Secured Claims

Secured Claims are claims secured by liens on property of the estate.  The Debtor has one two (2) secured creditors, namely, First Security and Bradford Place POA.  First Security secured claim has priority over Bradford Place POA.

### 2.    Classes of Priority Unsecured Claims

Certain priority claims that are referred to in Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes.  These types of claims are entitled to priority treatment as follows: the Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim.  However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims.

13

### 3.    Class of General Unsecured Claims

General Unsecured Claims are unsecured claims not entitled to priority under Code Section 507 (a).  The Plan's treatment and not the treatment described in the Agreed Disclosure Statement will control the treatment of this class.

### 4.    Class(es) of Interest Holders

Interest Holders are the parties who hold ownership interest (i.e., equity interest) in the Debtor.  If the Debtor is a corporation, entities holding preferred or common stock in the Debtor are interest holders.  If the Debtor is a partnership, the interest holders include both general and limited partners.  If the Debtor is an individual, the Debtor is the interest holder.  In this Chapter 11, the two partners who hold an ownership interest in the Debtor are Hossein Kouchehbagh and Vahideh Zamani.

### D.    Means of Effectuating the Plan

### 1.    Funding for the Plan

The Debtor will fund its Plan from the renting or leasing of the retained properties and the sale of properties when an offer of significant value is made by a prospective Buyer.  The Debtor has retained the properties which are of most value and which would allow the Debtor to remain solvent during its Plan term.

First Security's Plan is a plan of liquidation.  Funding for its Plan will come from the sale of the properties on which it has a judgment and mortgage lien.

### 2.    Post-confirmation Management

Hossein Kouchehbagh will continue to manage the affairs of the Debtor after confirmation.  First Security will be responsible for arranging for the liquidation of the real

14

property through a foreclosure sale held in the foreclosure action in accordance with Arkansas law.

### 3.   Disbursing Agent

Hossein Kouchehbagh will act as the disbursing agent for the purpose of making all distributions provided for under the Debtor's Plan.  Under First Security's Plan, First Security will foreclose and liquidate the real properties, and the surplus proceeds from this liquidation will be distributed.  Disbursing Agent shall serve without bond and shall not receive any compensation for such services.

### 4.   Risk Factors

The Debtor's Plan has the following risks: (1) The Debtor could lose renters and not be able to replace them in a timely manner which would cause a temporary cash flow problem; (2) Any business is subject to the risks of doing business and unforeseen circumstances.  Lawsuits, weather related damages, and unanticipated repair costs could all potentially affect the smooth operation of the Debtor; (3) the retained properties may not generate the amount of equity expected which will not allow for the elimination of the debt service expeditiously as intended.

First Security's Plan could have the following risks: the properties, when sold at a foreclosure action, could fail to bring enough money to pay First Security's lien in full and/or could fail to bring enough money to pay the remaining creditors.

### V.   OTHER PROVISIONS OF THE PLAN

### A.   Executory Contracts and Unexpired Leases

Under the Debtor's Plan, The Debtor will maintain the leasing arrangements with all

of its tenants as entered into in the normal course of the Debtor's business.  These leasing agreements are reflected in schedule G of the Debtor's bankruptcy Petition.

**B.      Changes in Rates Subject to Regulatory Commission Approval**

The Debtor is not subject to governmental regulatory commission approval of its rates.

**C.      Retention of Jurisdiction**

The Bankruptcy Court will retain jurisdiction to the extent provided by law.

**D.      Tax Consequences of the Plan**

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLANS MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.  The Debtor and First Security CANNOT and DO NOT represent that the tax consequences contained below are the only tax consequences of the Plans because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.  The Debtor does not employ any employees and will not have any 940 or 941 tax issues.  Should the Debtor sell any of the owned properties, there would be the potential for capital gains taxes.

## VI.  CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF EITHER THE DEBTOR OR FIRST SECURITY'S PLANS SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of

16

alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims.  The proponents CANNOT and DO NOT represent the discussion contained below is a complete summary of the law on the topic.  Many requirements must be met before the Court can confirm a Plan.  Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays unsecured creditors at least as much as these creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible.  These requirements are not the only requirements for confirmation.

**A.    Who May Vote or Object**

**1.    Who May Object to Confirmation of the Plan**

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote on the acceptance or rejection of the Plan.

**2.    Who May Vote to Accept/Reject the Plan**

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

**a.    What is an Allowed Claim/Interest.**

As noted above, a creditor or interest holder must first have an allowed claim or interest to have the right to vote.  Generally, any proof of claim or interest will be allowed, unless a party in interest brings a motion objecting to the claim.  When an objection to a claim or interest is filed, the creditor or interest holder holding the claim of interest cannot vote unless the Court, after notice and a hearing, either overrules the objection or allows

17

the claim or interest for voting purposes.  The bar date for filing a proof of claim in this case has not yet been set by the court.  Once the Plan has been confirmed and a bar date set, all claims must be filed by the bar date to be paid.  A creditor or interest holder may have an allowed claim or interest even if a proof of claim was not timely filed.  A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim.  An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.

### b.      What is an Impaired Claim/Interest.

As noted above, an allowed claim or interest only has the right to vote if it is in a class that is impaired under a Plan.  A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.  For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the member of that class one hundred percent (100%) of what they are owed.  As to the Debtor's Plan, the Debtor believes that class 2, the claim of First Security Bank is an impaired class.  As to First Security's Plan, First Security believes that the claims of itself, any other secured creditors of Debtor, the claims of general unsecured creditors, and the claims of equity security holders (none are known at this time) could potentially be impaired depending on how much money the Debtor's real estate brings when it is liquidated.

### c.      Who is Not Entitled to Vote.

The following four types of claims are not entitled to vote: (1) claims that have been disallowed; (2) claims in an unimpaired class; (3) claims entitled to priority pursuant to

18

Code Sections 507 (a) (1), (2) and (8); and (4) claims in classes that do not receive or retain any value under a Plan.  Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted a Plan.  Claims entitled to priority under 507 (a) (1), (2) and (7) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Code.  Claims in classes that do not receive or retain any value under a Plan do not vote because such classes are deemed to have rejected a Plan.  EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO CONFIRMATION OF THE PLAN.

### 3.  Who may Vote in More Than One Class

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

### 4.  Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm a Plan unless (1) at least one impaired class has accepted a Plan without counting the votes of any insiders with that Class, and (2) all impaired classes have voted to accept a Plan, unless a Plan is eligible to be confirmed by "cramdown" or nonaccepting classes, as discussed herein.

### 5.  Votes Necessary to Accept the Plan

A class of claims is considered to have accepted a Plan when more than one-half (½) in number and at least two-thirds (2/3) in dollar amount of the claims which actually voted, voted in favor of a Plan.  A class of interests is considered to have accepted a Plan

19

when at least two-thirds (2/3) in amount of the interest-holders of such class which actually voted, voted to accept a Plan.

### 6.      Treatment of Nonaccepting Classes

As noted above, even if all impaired classes do not accept the proposed Plan, the Court may nonetheless confirm a Plan if the nonaccepting classes are treated in the manner required by the Code.  The process by which nonaccepting classes are forced to be bound by the terms of a Plan is commonly referred to as "cramdown." The Code allows a Plan to be "crammed down" on nonaccepting classes of claims or interests if it meets all consensual requirements except voting requirements of 11 USC Section 1129 (a) (8) and if a Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept a Plan as referred to in 11  USC Section 1129 (b) and applicable case law.

### 7.      Request for Confirmation Despite Nonacceptance by Impaired Class(es).

The party proposing this Plan will ask the Court to confirm this Plan by cramdown on any impaired classes if this Class does not vote to accept the Plan.

### B.      Liquidation Analysis

Under the Best Interest Test, if a claimant or interest holder is an impaired class and that claimant does not vote to accept a Plan, then the claimant or interest holder must receive or retain under a Plan property of value not less than the amount that such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien.  Administrative claims are paid next.  Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority.  Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims.  Finally, interest holders receive the balance that remains after all creditors are paid, if any.  For the Court to be able to confirm this Plan, the Court must find that all creditors and interest holders who do not accept the plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation.

The Debtor has the following assets which are primarily comprised of real estate owned by the Debtor and secured by a note and mortgage in favor of First Security Bank. The liquidation analysis does not include a minimal amount of money in checking account at the time of filing or uncollected accounts receivable.  Values listed beside each parcel of property are based upon the Debtor's estimate of their appraised value:

| PROPERTY | VALUE |
|---|---|
| 1395 Henri de Tonti, Tontitown | $7,300,000.00 |
| 2325 N. College Ave., Fayetteville | $320,000.00 |
| 219 S. Thompson St., Springdale | $400,000.00 |
| 57 N. Allen Street, Fayetteville | $250,000.00 |
| 2134 N. Garland Ave., Fayetteville | $128,000.00 |
| 509 E. Huntsville, Fayetteville | $185,000.00 |
| N. Gregg, Fayetteville (20 acres) | $500,000.00 |

21

|  |  |
|---|---|
| 818 N. Center Street, Elkins | $900,000.00 |
| 9 Haskell Carnes Road, Farmington | $500,000.00 |
| **TOTAL:** | **$10,483,000.00** |

The following represents the liabilities of the Debtor:

| Creditor | Liability |
|---|---|
| First Security Bank | $5,934,285.51[2] |
| Washington County Tax Collector | $32,000.00 |
| Arkansas Western Gas | $3,300.00 |
| **TOTAL:** | **$5,969,585.51** |

Based on updated appraisals obtained in December 2010, First Security Bank estimates that the Debtor's real property has the following valuations:

| PROPERTY | VALUE |
|---|---|
| 1395 Henri de Tonti, Tontitown | $5,775,000.00 |
| 2325 N. College Ave., Fayetteville | $235,000.00 |
| 219 S. Thompson St., Springdale | $455,000.00 |
| 57 N. Allen Street, Fayetteville | $190,000.00 |
| 2134 N. Garland Ave., Fayetteville | $77,000.00 |
| 509 E. Huntsville, Fayetteville | $154,000.00 |
| N. Gregg, Fayetteville (20 acres) | $385,000.00 |
| 818 N. Center Street, Elkins | $236,000.00 |
| 9 Haskell Carnes Road, Farmington | $270,000.00 |
| **TOTAL:** | **$7,777,000.00** |

---

[2]As of April 20, 2011.

First Security Bank has assumed that as of April 20, 2011, the Debtor has liabilities of $5,969,585.51.  Assuming the real property was sold at appraised value, Debtor would have approximately $1,800,000.00 available to the Debtor.  However, the appraised value assumes that the real properties (i) need no monies expended to bring the properties to a condition whereby they can possibly bring appraised value and (ii) can be sold for appraised value.  Further, the funds available to Debtor calculation assumes (i) the liabilities listed above are correct as of April 20, 2011, and remain static and (ii) the properties are sold for appraised value with no additional transaction and closing costs deducted, such as real estate commissions and other fees normally associated with the sale of real properties.  Interest continues to accrue daily on the indebtedness due and owing to First Security Bank, and costs of collection continue to be incurred by First Security Bank, which will further reduce the amount available to Debtor assuming that the real property is sold.

**C.   Feasibility**

Another requirement of confirmation involves the feasibility of the Plan which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.  There are at least two important aspects of feasibility analysis.  The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses which are entitled to be paid on such date.  The second aspect considers whether the Proponent will have enough cash over the life of the Plan to make the required Plan payments.

As of January 1, 2011, the Debtor has the following units rented which generates monthly cash flow in the following amounts:

| 1395 HENRI DE TONTI | RENT |
|---|---|
| Titco, Inc. | $2,000.00 |
| Flex Staff | $1,750.00 |
| Mandarin Bistro | $2,280.00 |
| Awakening Church | $2,000.00 |
| Springdale Treatment Center | $2,500.00 |
| Lease parking lot | $300.00 |
| Padrismo | $7,500.00 |
| **OTHER PROPERTIES** | |
| 219 S. Thompson | $100.00 |
| Elkins Property | $84.00 |
| **TOTAL:** | **$18,514.00** |

The Debtor anticipates to increase the cash flow by the following amounts over the first quarter of 2011:

| TENANT | RENT |
|---|---|
| Citgo Gas Station (Beginning February 2011) | $3,500.00 |
| Titco, Inc. (additional space) (Beginning February 2, 2011) | $600.00 |
| 2134 N. Garland (Beginning February 1, 2011) | $500.00 |
| 2325 College (Beginning February/March 2011) | $1,500.00 |
| **TOTAL OF RENTAL INCREASE FOR FIRST QUARTER 2011:** | **$6,100.00** |

24

Long term the Debtor expects the following increases in cash flow:

| TENANT | RENT |
|---|---|
| Mexican Restaurant (Beginning April/May 2011) | $2,000.00 |

Debtor could lease out properties at any time and a cash flow analysis beyond this point is unrealistic. The Debtor believes that the 1395 Henri de Tonti property has the ability to generate in excess of Forty Thousand and No/100 Dollars ($40,000.00) per month cash flow if all units were rented.

First Security believes that the rental figures estimated by the Debtor are not realistic. Additionally, the rental figures outlined above do not reflect the fact that as a result of the April 2011 fire, the Citgo gas station is currently vacant.

First Security Bank believes that, assuming that the properties (less and except the two properties that Debtor proposes to retain) are sold at appraised value, the indebtedness due and owing to First Security Bank would be reduced by the amount of $1,767,000.00 as shown by the appraised value shown by First Security Bank on the Liquidation Analysis. Any monies realized from any such sale will be reduced by the amount of accrued interest and transaction fees, maintenance and rehabilitation costs incurred with regard to the properties, and costs of collections.

## VII.  EFFECT OF CONFIRMATION OF PLAN

### A.    Discharge

The Debtor's plan provides that upon payment in full of proposed plan payments to the unsecured creditors, the Debtor shall be discharged of liability for payment of debts incurred before confirmation of the enclosed Plan, to the extent specified in 11 U.S.C.

Section 1141.  However, the discharge will not discharge any liability imposed by the Plan.

First Security's plan provides that the Debtor will receive a discharge after liquidation.

### B.     Revesting of Property in the Debtors

Except as provided in Section (V.E.), and except as provided elsewhere in the Plan, the confirmation of the Debtor's Plan revests all of the property of the estate in the Debtor. Confirmation of First Security's Plan will result in the real property fo the estate being liquidated at a foreclosure sale.

### C.     Modification of Plan

The Proponent of the Plan may modify the Plan at any time before confirmation. However, the Court may require a new Disclosure Statement and/or revoting on the Plan. The Proponent of the Plan may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.

### C.     Post-Confirmation Status Report

Within one hundred twenty (120) days of the entry of the order confirming the Plan, Plan Proponent shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan.  The status report shall be served on the United States Trustee, the twenty largest unsecured creditors, and those parties who have requested special notice.  Further status reports shall be filed every one hundred twenty (120) days and served on the same entities.

26

### D. Post-Confirmation Conversion/Dismissal

A creditor or party in interest may bring a motion to convert or to dismiss the case under 1112(b), after the Plan is confirmed, if there is a default in performing the Plan. If the Court orders the case to be converted to a chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the plan, will revest in the Chapter 7 estate. The automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Court during this case. The order confirming the Plan may also be revoked under very limited circumstances. The Court may revoke the order if the order of confirmation was procured by fraud and if the party in interest brings an adversary proceeding to revoke confirmation within one hundred eighty (180) days after the entry of the order of confirmation.

### E. Final Decree

Once the estate has been fully administered as referred to in Bankruptcy Rule 3022, the Plan Proponent, or other party as the Court may designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case.

Date: June 22, 2011

/s/ Hossein Kouchehbagh
Hossein Kouchehbagh, for the Debtor

/s/ Don Brady
Don Brady,
Attorney for Debtor as Plan Proponent
Blair, Brady & Henson
109 N. 34th Street
Rogers, Arkansas 72756
479-631-0100

27

and

GARY D. JILES, P.A.
The Frauenthal Building
904 Front Street
Conway, Arkansas 72032
(501) 329-1133
gjiles@conwaycorp.net

June 28, 2011                          By: /s/ Gary D. Jiles
                                           Gary D. Jiles (88-118)

                                       Attorneys for Secured Creditor, First
                                       Security Bank as Plan Proponent

28